# EXHIBIT 2



AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

American Arbitration Association

Case Number: 02-16-0003-2470

Richard and Samantha Blaker, Appellees

-v-

Credit One Bank, Appellant

## FINAL AWARD

Pursuant to the Consumer Arbitration Rules of the American Arbitration Association ("AAA") an in-person evidentiary hearing was held on April 18-19, 2018, before Arbitrators Janice Sperow, William Tucker, and Leo Sullivan. The parties to this arbitration are claimants Samantha and Richard Blaker, consumers and former credit cardholders of respondent, and respondent Credit One Bank, a nationally chartered bank with headquarters in Nevada.

## PROCEDURAL HISTORY

Claimants sued respondent for alleged debt collections and credit reporting violations stemming from their two credit cards with the bank. Respondent moved to compel arbitration pursuant to the parties' written contract. The court granted the motion.

Claimants thereafter initiated arbitration on August 1, 2016 when they filed their arbitration claim with the AAA under its consumer rules. Exh. C. Claimants alleged that respondent violated California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code Section 1788, et. seq. ("Rosenthal Act"), California's Consumer Credit Reporting Agencies Act, Cal. Civ. Code Section 1785, et. seq. ("CCRAA"), and their common law privacy rights ("privacy"). Claimants amended their arbitration claim to add a federal Telephone Consumer Protection Act cause of action under 47 U.S.C. Section 227 et. seq. ("TCPA"). Respondent denied all claims. Respondent initially counterclaimed for monies owed and attorneys' fees. Respondent later dropped its counterclaim and fee request.

The arbitration proceeded to hearing before a single arbitrator on August 3 and 4, 2017. The arbitrator found for claimants on all causes of action. See Final Award dated September 18, 2017 attached as Exh. B to Respondent's Amended Notice of Appeal. ("Final Award"). Respondent appealed the decision pursuant to the parties' arbitration clause requesting a new hearing before "a panel of three neutral arbitrators" which will "consider all factual and legal issues anew." See Cardholder Agreement at 6-7 under Arbitration Agreement attached as Exh. A to respondent's Amended Notice of Appeal.

1

The AAA appointed this three-person panel to hear the appeal, and the parties accepted the panel.

Claimants objected that the appeal was not properly before the panel because the parties' agreement required respondent to request a new hearing within 15 days from the award and instead respondent filed a notice of appeal within 15 days from the final award. On January 16, 2018, the panel found that respondent had properly appealed pursuant to the contract, that it had properly and timely requested a new hearing, and that the panel had jurisdiction. See Report of Preliminary Telephone Conference, dated January 16, 2018.

The panel reviewed the case de novo and held a new in-person evidentiary hearing on April 18 and 19, 2018. At hearing, claimants sought $2000 in statutory damages under the Rosenthal Act, $30,000 in statutory damages under the CCRAA, $370,500 in statutory damages under the TCPA, $75,000 in emotional distress/ pain and suffering damages under the invasion of privacy claim and all 3 statutes, $262,572 in loss of credit /economic damages under the CCRAA and Rosenthal Act, attorneys' fees under CCRAA and the Rosenthal Act, and costs under all causes of action. See Claimants' Draft Form of Award submitted April 18, 2018 and Claimants' Itemization of Damages dated April 9, 2018. Claimants originally sought punitive damages to which Respondent objected. See Arbitration Claim, dated August 1, 2016 at 6, Exh. C. At hearing, claimants withdrew their request for punitive damages. Therefore, the panel finds the issues of the availability and amount of punitive damages, if any, to be moot.

On the first day of hearing, both parties submitted supplemental briefs updating the panel on decisions rendered since the Final Award. Respondent also renewed its original motion in limine from the first arbitration to exclude five categories of evidence. Claimants renewed their objections. The panel ruled the motion moot as to written communication from claimants, claimants' telephone records, and Mr. White's testimony as claimants did not intend to introduce any of these categories into evidence. The panel denied the motion as to the third-party lender emails and business damages evidence without prejudice; later, the panel overruled the objections to the documents.

Respondent also moved to exclude the Final Award. The panel denied the motion because both parties attached it as an exhibit to their pleadings and respondent used it to identify appealable factual and legal errors in its Amended Notice of Appeal. The panel, however, finds that the prior decision is relevant only as to procedural purposes related to the appeal and does not bind it.

After the two-day hearing, the panel issued an Interim Award on June 5, 2018 with instructions to address the propriety and amount of attorneys' fees for the prevailing party. The panel then closed the hearing on June 19, 2018 after the submission of post-hearing briefs on the issue of attorneys' fees. Afterward the panel deliberated and now issues this FINAL AWARD.

## FACTUAL BACKGROUND & FINDINGS

2

Mrs. Blaker opened two credit card accounts via online applications with respondent on behalf of both her husband and herself. See screenshots of pages from her online applications, Exhs. A & B. She wanted to use them to segregate personal expenses from business expenses for tax accounting purposes. Respondent opened a credit card account for Mr. Blaker on May 10, 2014 with a $700 credit limit, and an account for Mrs. Blaker on July 20, 2014 with a $500 credit limit. Both received a schedule of interest rates and charges and a written contract of terms and conditions with their cards in the mail. See Exh. S, also attached to claimants' original arbitration claim as Exh. A. Both agreed to pay an Annual Membership Fee defined in those terms and conditions as a lump sum $75 charge for the first year and a $99 fee for subsequent years charged in monthly installments of $8.25 per month. See Exh. S under Fees.

Mrs. Blaker handled all the finances for the family and listed her cell phone number (the "1300 number") as the primary contact number for both accounts with her husband's cell phone number (the "1581 number") as the alternative secondary number on his account. Mrs. Blaker was an authorized user on Mr. Blaker's account and paid an authorized user fee of $19. See Exh. S under Fees. Claimants handled their accounts online; accordingly, Mrs. Blaker elected to receive only electronic statements. All bank notifications were sent to claimants by email. Other than the cards and terms and conditions, claimants did not receive any written documentation or written statements from respondent. (Later, they received a hard copy of a refund check (Exh. 10) and, according to respondent, a letter from the President (Exhs. 4-5)). They handled all payments exclusively online.

Toward the end of 2014, Mrs. Blaker decided to cancel the two credit cards because the fees were "too high" and her husband was still comingling business and personal expenses on his account. She asked her husband to stop using his card, so she could pay it off and cancel it. Mr. Blaker agreed and last used his card on November 29, 2014, and Mrs. Blaker last used her card on December 7, 2014. See Exh. Q account statements. Thereafter, Mrs. Blaker paid off the cards in full: December 18, 2014 for Mr. Blaker's card and January 8, 2015 for Mrs. Blaker's card. See Exh. Q. The parties agree that claimants timely paid their balance each month in 2014. As of December 2014, Mr. Blaker had a $49.99 credit on this account.

Mrs. Blaker credibly testified that, at the end of January or early February 2015, she called respondent and attempted to, and believes that she did in fact, cancel both credit cards. She remembers the call explicitly because, at that time, respondent transferred her call to another operator who offered to provide her with 3 months free of charges if she elected to remain a customer. She declined and repeated her desire to cancel the cards. Respondent transferred her to another operator who also offered her fee free credit – this time for 6 months – if she chose to keep her cards. She again declined and reiterated her wish to cancel the cards. At this point, respondent asked her to get Mr. Blaker on the line to authorize the cancellation of his card. She did so. Claimants believed that they had cancelled their credit cards with respondent by the end of this call.

3

Respondent, through Vice President of Portfolio Services Gary Harwood ("VP Harwood"), equally credibly testified that it has no record of this call. As part of its general practices, respondent records all customer calls. It retained these recordings at the time for two years for payment calls and for 90 days for non-payment calls. Respondent required its vendors to follow this policy. Some vendors retained nonpayment calls for longer than 90 days pursuant to their own retention policies, but respondent did not require them to do so. (Respondent has since amended its procedures and now requires all recorded calls to be retained for at least two years.) There is no recording available for any call from claimants in late January/ early February 2015.

Moreover, respondent showed that the call is not listed in its telephone call logs (Exh. V) or account notes (Exh. U). VP Harwood also testified that, after the first arbitration, he personally generated a computer search for all calls associated with claimants' accounts and could find no record of any such call. He found a total of 4 inbound (customer initiated) calls, 2 on each account. All other calls were outbound calls initiated by respondent and its vendors. Respondent believes that claimants did not call and cancel their cards at this time. In any event, respondent did not cancel the cards on its end, and the accounts remained open without activity for a few months.

In March 2015, Mrs. Blaker checked her online statement to confirm its cancellation. She found no statement for the month and concluded that respondent had processed her cancellation request. Respondent and its records confirm that Mrs. Blaker had no online statement for that month because, as VP Harwood explained, the bank does not post a statement when the balance is $0. See Exh. Q. Respondent did post an online statement for Mr. Blaker's account because, at that time, he had a credit for $49.99. See Exh. Q.

In May 2015, upon Mr. Blaker's card's anniversary, respondent charged claimants the first monthly installment of $8.25 of the next year's Annual Membership Fee and its annual authorized user fee of $19. See Exh. Q. According to VP Harwood, respondent sent claimants a written letter of notification of the annual fee as required by law and contract, but claimants never received it by mail or email. Respondent did not introduce the letter into evidence.

Claimants did not initially pay this monthly bill. Mrs. Blaker did not think they had a balance because she believed that she had effectively cancelled the cards in January/February 2015 and had stopped checking for online statements after March 2015.

The following month, in June 2015, respondent charged Mr. Blaker the next installment of the Annual Membership Fee and a late charge because claimants had not paid the previous month's bill. See Exh. Q. In July 2015, respondent likewise charged Mrs. Blaker the monthly installment of the Annual Membership Fee upon the anniversary of her account opening and a late fee the next month when claimants did not pay their bills

4

on time. See Exh. Q. Again, VP Hardwood testified that the bank sent claimants the legally required notification letter of the annual fee, but claimants did not receive it. Respondent did not introduce the letter into evidence.

According to claimants, respondent and its third-party vendors began to call the 1300 number to collect payment beginning in approximately July 2015. Mrs. Blaker testified that she learned for the first time in July 2015 that she was supposedly "late" on the accounts. She explained to the operator that she had canceled the cards months ago and became very frustrated. She testified that she tried to cancel the cards online but could not find any online cancellation option. Respondent verified that customers cannot cancel online.

Over the summer and fall of 2015, Mrs. Blaker and respondent engaged in a pattern of communications in which Mrs. Blaker repeated her request to cancel the cards and respondent repeated its request that she pay the charges owed on her account. Frustrated, Mrs. Blaker paid the charges because she "believed that she had to pay them in order to get" respondent "to cancel the cards." On one occasion, after the final $61 payment, respondent told claimants that it could not cancel the cards until the payment "posted." Afterwards, Mrs. Blaker often would not answer respondent's calls, especially when she was at work, but she never blocked any calls or sent any calls to voicemail.

VP Harwood testified that respondent does not require customers to pay off their accounts before cancelling them. Instead, a customer may request cancellation and then continue to pay off the balance after cancellation. Respondent then formally closes the account once it reaches a $0 balance. However, respondent presented no evidence that it ever explained this process to claimants.

In any event, respondent did not close the accounts after her payments. Instead, once respondent reached claimants by phone or received a payment, it stopped calling for 30 days during which it charged another monthly installment on the accounts and a late fee if applicable. Not hearing from respondent during this 30-day period, claimants believed that the payment had satisfied the bank and that it had processed their cancellation request.

The parties essentially created a miscommunication cycle where claimants thought they had cancelled accounts, but respondent had not closed them because claimants did not complete respondent's cancellation process; respondent would then charge the next monthly installment of the Annual Membership Fee and a late charge if applicable because, in its records, the accounts remained open; claimants would then later receive collections calls notifying them that they were late in their payments for accounts which in their minds they had already closed months prior; claimants would then pay off the charges in order to cancel the cards again, but respondent did not close the accounts because the request did not reach the "escalation team" needed to complete cancellation; and the cycle would repeat.

5

Finally, claimants "had had enough." According to claimants, they did not owe the fees but had paid them only to facilitate the closure of their accounts. When their accounts remained open, with monthly fees, late charges, and interest accruing despite their cancellation efforts, Mrs. Blaker cut up the cards and physically mailed them to respondent in approximately September 2015 along with a written letter requesting cancellation of the credit cards. Respondent has no record of receiving the letter or the cut-up cards. VP Harwood testified that he spoke to the Vice President of Mailing and verified that no cards associated with claimants' accounts had been returned. The letter, however, was not returned to claimants.

Afterward, claimants refused to continue to pay the fees on the cards. As a result, the collection calls intensified. Respondent's account notes and telephone logs show that as early as November 28, 2015, claimants had verbally disputed the charges and refused to pay them. See Exhs. U & V. Similarly, respondent's telephone logs and account notes show that on January 2, 2016 claimant again identified herself and said according to the operator's notes: "I don't owe anything; cancel my card."

In addition to the telephone logs and account notes, claimants also introduced recordings of a few preserved calls with Mrs. Blaker, including a December 30, 2015 and a January 2, 2016 call. See Exh. 29. In the December call, Mrs. Blaker confirmed that she had "cancelled the cards months ago" and stated "don't call again." And in the January call, Mrs. Blaker reiterated that she had "canceled the cards over five months ago" and warned respondent not to call again or she would sue them. The operator asked claimant to hold the line so someone could "help her," but she hung up before the next operator could continue the call.

Each time claimants refused to pay over the phone, respondent followed its policy of stopping collection calls for 30 days, but it did not adjust or close the account, explain the cancellation process, investigate the reasons for claimants' refusal to pay the fees, cancel the cards, or attempt to resolve the dispute. It simply left the account open and resumed collection calls 30 days later. When claimants stopped answering respondent's calls completely, respondent responded by intensifying its collection efforts, calling claimants 228 times on the 1300 number and 19 times on the 1581 number for a total of 247 calls in 19 days in February 2016.

Respondent also reported claimants' failure to pay the fees to three credit reporting agencies: Equifax, Experian, and TransUnion. See Exhs E-G, R & 12-18 (credit profiles and reports). Respondent routinely reports to all three credit bureaus on a monthly basis. Respondent reported both accounts as delinquent for failure to timely pay – one month for Mrs. Blaker's account and three months (November 2015, December 2015, and January 2016) for Mr. Blaker's account. The reported delinquencies on the cards consisted solely of respondent generated fees and charges; the claimants did not use the cards after November and December 2014. Respondent did not report that claimants disputed the charges.

At the time of these reports, claimants hoped to refinance their home to remove the costly monthly PMI (private mortgage insurance). See Exh. 19. Mrs. Blaker explored refinance with Navy Federal Credit but was told not to bother formally applying for a refinance because claimants' credit rating had dropped and they no longer qualified. The Navy Federal Credit representative then turned the computer screen around so Mrs. Blaker could see the "soft FICO" number. At that time, claimants realized that respondent must have reported their accounts as delinquent.

According to claimants, respondent's reporting set off a domino effect of financial hardships. See e.g., Exhs. 20-23. Mr. Blaker's credit score dropped approximately 200 points. See Exh. 12. Other creditors, such as Home Depot, Loews, and Walmart, started to lower their credit limits to balances owed. Additionally, claimants had planned to purchase and "flip" two properties with Mrs. Blaker's brother Mr. White as they had done 5 times in the past (3 on their own and 2 with White) but now no longer qualified for financing of these projects which they then abandoned. See Exhs. 25-26 & 33-34.

On February 10, 2016, with their accounts still open and their credit ratings damaged, claimants filed an online customer complaint with the United States Office of the Comptroller of the Currency ("OCC") requesting help. After the OCC forwarded the complaint to it, respondent closed the accounts, waived all fees, late charges, and all balances and reported zero balances to all three credit reporting agencies. Claimants received their last collection call on February 19, 2016. Respondent confirmed its OCC response in a letter to claimants dated February 25, 2016. Exh. D; Exhs. 4-5. Claimants do not recall receiving the letter. The credit reporting agency documentation confirms that respondent zeroed the balances and reported the credit card balances as "current" by the end of February 2016. See, e.g., Exhs. E-G. All parties agree that the problems with claimants' credit cards and credit reporting had been solved by the end of February 2016.

## LEGAL ANALYSIS & FINDINGS

### Rosenthal Act Violation

The Rosenthal Act prohibits improper debt collection practices, including harassing, abusive, oppressive, or unconscionable conduct. It includes causing a telephone to ring repeatedly or continuously to annoy the recipient, even if unanswered or on vibrate. See Cal. Civ. Code Section 1788.11 (d). It follows and, in some areas, extends the Federal Fair Debt Collections Practices Act. Claimants bear the burden of proving that respondent engaged in the legally proscribed manner when it attempted to collect a debt from them.

Claimants cite to respondent's telephone logs, account notes, and records to show that respondent called claimants on the 1300 and 1581 numbers over 300 times. See Exhs. U-V; see also Exh. 32 (summarizing the number of calls from the telephone logs). Respondent does not dispute this number of calls. On the contrary, respondent acknowledged that it undertook many "attempts to aggressively communicate" with

7

claimants when their accounts showed an overdue balance but asserts that claimants consented to the calls in the parties' contractual terms and conditions.

*Consent to Calls*

The panel finds that the agreement does include an albeit ambiguous consent provision. The terms and conditions provide in paragraph 19 entitled Communications: "You are providing express written permission authorizing Credit One Bank or its agents to contact you at any phone number (including mobile, cellular/wireless, or similar devices) or email address you provide at anytime for any lawful purpose." See Exh. P.

The provision is ambiguous because it seems to imply that claimants will provide a separate consent document, not that the provision itself is the consent. The panel construes the document against respondent, as the exclusive drafter of a non-negotiated adhesion contract. The parties did not bargain for and negotiate these terms and conditions. Instead, respondent wrote and prepared its standard contract which claimants could either accept as is or reject. As VP Harwood explained, claimants would not be accepted as Bank One credit cardholders if they did not accept the terms and conditions as written by respondent.

However, the panel finds that claimants did unambiguously consent to be called by respondent when they completed the online application. As VP Harwood testified, the online application includes a box containing the following: "I authorize Credit One Bank or its agents to contact me at any phone number I provided at anytime (including cellular, wireless telephone services, via a live operator, auto-dialer or prerecorded message)." See proffered Exh. W, as example. (The panel excluded proffered Exh. W for lack of foundation but admitted and credits VP Harwood's testimony that claimants accepted this same language when they applied online because respondent would not have approved the application without this online consent.)

*Scope of Claimants' Consent*

Claimants' consent, however, does not preclude a Rosenthal Act violation. Claimants consented to receive calls to the phone numbers they provided to respondent. They also consented to receive calls to those numbers using the specific technology methods listed. But they did not consent to the frequency or number of collection calls initiated by respondents. They did not consent to collection calls conducted in the manner prohibited by the Rosenthal Act. Nor did they consent to a waiver of the Rosenthal Act's protections. Taken to its logical extreme, respondent's argument would mean that debt collectors can violate the Rosenthal Act as long as their customers consented to receive calls in their non-negotiated written terms and conditions or in an online checked box. The panel rejects this argument as a matter of law and public policy: claimants consented to collection calls; they did not consent to a harassingly high volume of collection calls.

8

The panel finds the frequency and total number of collection calls to be harassing, annoying, abusive, and unreasonable for purposes of the Rosenthal Act. Respondent violated the Rosenthal Act when it placed an undisputed 247 calls to claimants in a 19-day period.

*Bona Fide Error Affirmative Defense*

Respondent argues that, even if it did violate the Rosenthal Act, it still escapes liability under the bona fide error defense. Claimants counter that the defense is not available because the Rosenthal Act is a strict liability statute. The panel questions whether the defense is legally available but nevertheless addresses it since respondent raised it as a ground for denying liability. Under the bona fide error defense, respondent argues that it cannot be held liable if it proves that it violated the Rosenthal Act "unintentionally," that the violation resulted from a bona fide error, and that it maintained procedures reasonably designed to avoid such violations. See McCollough v. Johnson, Rodenburg & Lauinger, LLC, 637 F.3d 939, 948 (9th Cir. 2011). Respondent bears the burden of proof on this affirmative defense.

- *Intent*

The panel finds that the calls were made intentionally and knowingly. Respondent nightly provided its vendors with a list of numbers to call the next day. It chose to list claimants' numbers on that nightly list 19 days in a row in February even though it saw from the nightly data upload from its vendors that the vendors had called the claimants multiple times and sometimes as many as 16 calls a day during this period. See Exhs. U-V.

- *Bona Fide Error*

The panel agrees that the violation initially resulted from a bona fide error in that respondent genuinely believed that claimants had not yet cancelled their cards and that they therefore owed the charges and fees charged to their accounts. However, once the claimants told respondent that they canceled the cards "months ago," respondent knew that claimants disputed the charges. See Exh. 29. Respondent telephone logs and notes indicate "RTPF" which VP Harwood explained means that the operator noted that the customer "refused to pay the fees." See Exhs. U-V. Thus, according to its own records, respondent knew as early as November 28, 2015 that claimants disputed the fees. Yet, it still persisted in calling repeatedly and frequently to an unreasonable, harassing level of 247 calls in 19 days in February 2016 without attempting to resolve the parties' dispute over the fees. Accordingly, the panel finds that the February 2016 calls did not result from a bona fide error.

- *Procedures to Avoid Violations*

The panel also finds that respondent did not satisfy its burden of proving that it had implemented sufficient procedures reasonably designed to avoid Rosenthal Act

9

violations. VP Harwood testified that respondent had 3 procedures in place to avoid Rosenthal violations: first, respondent directed its vendors to limit its calls to 8 per day per account; second, if the operator actually spoke with a live, identified customer then calls could be halted for 30 days to give the customer time to pay their account, and third, if the customer requested not to be called, then respondent would block further calls to that number.

The panel finds the procedures well-intended, especially for customers who genuinely owe debts and need a reminder and time to pay, but not reasonably designed to prevent Rosenthal Act violations where, as here, the customer has multiple accounts assigned to one primary number, disputes the charges, believes – even if according to respondent wrongly – that she has cancelled the accounts, and has repeatedly asked not to be called to collect fees she does not believe she owes.

Here, claimants listed the 1300 number as the primary number for both accounts since Mrs. Blaker handled all the finances for the household. Accordingly, respondent conceded that, under its policy which allows up to 8 calls a day <u>per account</u> – not per telephone number, vendors could place up to 16 calls a day to the 1300 number without violating respondent's call procedures. And since respondent does not limit the number of calls per week or month, its debt collector could easily call a single number 112 times a week or 480 calls a month without violating respondent's policy. It is this policy that permitted 247 calls in 19 days to the 1300 and 1581 numbers. The panel finds this policy unreasonable to avoid Rosenthal Act violations as implemented to telephone numbers listed as the primary number on more than one account. Sixteen calls a day averages to more than one call per hour during the 8 am to 9 pm time window permitted by law. The panel finds this level of debt collection calling unreasonable, oppressive, harassing, annoying, and violative of the Rosenthal Act.

Similarly, the 30-day hold procedure – while worthwhile for customers who agree they owe a late balance on their account – is not reasonably designed to avoid Rosenthal Act violations where the customer disputes the charges. Instead, it has the opposite effect. While the calls stop temporarily, the added time does nothing to ameliorate the dispute, rectify the account, if needed, or otherwise permit reconciliation between the parties. Rather it allows interest and additional late fees to accumulate for another 30 days at which time the harassing calls resume.

Lastly, the panel applauds respondent's procedure of blocking calls to a number once the customer requests that calls cease. If properly implemented, it could reasonably avoid future Rosenthal Act violations (although it does not prevent violations that have already occurred). Unfortunately, respondent did not properly implement its own policy in this case. Respondent's representatives continued to call claimants 247 times in 19 days <u>after</u> Mrs. Blaker warned respondent not to call again. <u>See</u> Exh. 29 (recording of call January 2, 2016 call). Accordingly, the panel finds that respondent did not sustain its burden of proving the affirmative defense of bona fide error.

*Damages*

10

The Rosenthal Act provides for both "actual damages" and a penalty of not less than $100 and not more than $1,000 per individual. The Rosenthal Act also provides for attorneys' fees.

- *Actual Damages: Economic Losses*

Claimants requested actual damages of $262,572 in loss of credit and economic damages. (Claimants' post-appeal brief lowered that amount to $131,286). Claimants requested two categories of financial loss damages: the loss of profits from the abandoned purchase and flip of 2 properties and the continued cost of the monthly PMI they endured due to their inability to obtain refinance. The panel finds that claimants have failed to prove causation for both categories of the requested economic damages and that claimants have failed to prove that the real estate economic damages are sufficiently concrete and ascertainable to be awarded.

  - *Causation*

As to the refinance, the panel finds that claimants have not proven causation. Claimants testified that they were unable to obtain a refinance after the reported problems with respondent. The panel credits this testimony and believes Mrs. Blaker that she could not successfully apply for a refinance given the FICO score. However, this testimony did not prove by a preponderance that the reported late accounts caused their inability to obtain a refinance.

While it is true that the claimants' credit scores went down after respondent reported the alleged deficiencies, other negatives on their credit history could have contributed to or exclusively caused the drop in their credit rating. VP Harwood credibly testified that even "inquiries" can cause a credit rating drop for up to a year as creditors worry that the customer is "shopping for a lot of credit." The panel also observed from the documentary evidence that Mr. Blaker had a negative credit report from a "collection" account which VP Harwood explained as "very negative." <u>See</u> Exh. 12.

Claimants argued that the other negative credit histories were both old and disputed and therefore did not cause or contribute to the significant 200-point drop. While this argument may be partially or completely accurate, claimants did not prove it; they merely stated it. They introduced no evidence on the issue other than their own testimony and belief, which, while the panel finds genuine and credible, does not constitute an expert opinion, documentary, or other evidence on how credit bureaus score and review credit reports. Claimants did not introduce evidence on what an acceptable refinance FICO score would have been and how claimants would have qualified for that score in the absence of respondent's reporting. Basically, claimants did not introduce evidence on causation – how and why respondent's reporting caused the score to drop and by how much, excluding the other negatives on their reports. Accordingly, the panel finds that claimants have not sustained their burden of proof as to these economic damages.

11

Likewise, the panel finds that claimants have not proven respondent's reporting caused the loss of "house flip" or real estate profits for the same reasons: other negatives on their reports could have easily contributed to or exclusively caused the drop in their scores which prevented them from moving forward with their plans.

      o   *Speculative Damages*

Additionally, the panel finds these loss of profit damages to be too speculative. Claimants did point to specific properties they hoped to purchase and flip but did not introduce concrete evidence of the costs to renovate, costs to purchase, partnership shares, fees and points, and net profits per claimant. Claimants admitted that they made no offers on any of these properties and never had a written denial of credit. Accordingly, the panel declines to award these damages on the alternative ground of too speculative.

- *Actual Damages: Pain and Suffering*

Claimants separately sought $75,000 in pain and suffering/emotional distress damages under the Rosenthal Act. While claimants did not introduce any medical evidence or documentary evidence of emotional distress, they testified very credibly to the pain and suffering they suffered as a result of the harassing level of calls. Mrs. Blaker was still visibly upset, frustrated, and angry at the hearing – three years later. Mr. Blaker testified about the annoyance to his work, the fighting and stress at home, and the interference with family time (their daughter and their young grandson live with the claimants). He acknowledged that his wife suffered greatly and more than he did as he was often at work.

Conversely, claimants did not introduce any evidence that the operators behaved rudely, outrageously, or disrespectfully. The recordings of the telephone calls presented at hearing revealed courteous representatives and decent behavior on respondent's behalf. Nevertheless, the process itself was frustrating and painful. Simply receiving this number of calls in the short span of time was outrageous itself. The panel therefore awards Richard Blaker $2,500 in actual damages for emotional distress/pain and suffering and Samantha Blaker $10,000 in actual damages for emotional distress/ pain and suffering.

- *Penalty*

The panel awards each claimant the maximum statutory penalty of $1,000.

- *Attorneys' Fees & Costs*

The panel awards claimants their reasonable attorneys' fees in the amount of $24,151.30 and costs in the amount of $1,106.15.

12

**CCRAA Violation**

The CCRAA, which essentially mirrors the federal Fair Credit Reporting Act ("FCRA"), proscribes the reporting of information to a credit reporting agency if the person knows or should know the information is incomplete or inaccurate. Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1169-73 (9th Cir. 2009).

*Inaccurate Information: Cancellation*

Claimants argue that respondent reported inaccurate information to the reporting agencies because they did not owe the fees and charges given that they cancelled the cards in late January/ early February 2015. Claimants testified that they cancelled their cards over the telephone no less than 3 times. Mrs. Blaker also testified that she cut up the cards themselves and mailed them to respondent at its P.O. Box address along with a letter requesting that respondent cancel their cards. She explained how she wanted to send the letter certified mail but, when she went to both UPS and her local post office, both explained that no one would be present to sign for the letter at a P.O. Box address, so she ultimately sent it regular mail.

Respondent counters that claimants never cancelled their cards. According to respondent, customers must actively close their account in one of two ways. First, they can cancel their accounts in writing as provided in the contract terms and conditions. Or, second, they can cancel their account verbally by telephone but only if they complete the telephone "escalation" process. Respondent permits telephonic cancellation – despite the contract's written cancellation requirement. However, it has not authorized and trained its frontline operators to process cancellations. Instead, it has trained its frontline operators to "escalate" and transfer a telephonic cancellation request to an "escalation team" which can then process it. VP Harwood testified that the operator places the customer on a brief hold – on average 90 seconds – while the operator transfers the call to an operator trained and authorized to accept cancellations.

Under this process, respondent asserts that claimants did not cancel their cards because (1) respondent has no record of the late January/ early February 2015 call; (2) Mrs. Blaker did not remain on the telephone in her later January 2, 2016 call in order to talk to the escalation team which had the authority to effectuate her cancellation; and (3) it never received her written letter request to cancel the cards.

The panel finds that both parties are correct: claimants genuinely believed they had cancelled, and did in fact cancel, their cards within the ordinary use of the term; but they did not cancel their cards under the escalation procedures used by respondent.

The panel is troubled by the difficulty faced by claimants in their efforts to cancel their accounts. Respondent seems to have made it difficult for customers, at least in this case, to effectuate a cancellation of their credit cards. They cannot cancel online, even though they can apply for, open, and pay for accounts online. They cannot cancel verbally without being transferred to one or more operators. They cannot cancel verbally

13

without first enduring a "retention sales pitch." VP Harwood conceded that the escalation team will try to first "market" the customer to get her to retain the card.

Moreover, respondents and their agents do not clearly explain the cancellation process to customers. The operators do not tell them that they can cancel by mail if they do not want to or cannot hold the line when they call in. Respondent does not note in the account notes, email the customer, write the customer, or take other steps to verify that the customer does in fact wish to cancel the account when – as here – the customer called in, identified herself, asked to cancel the card or stated that she thought she had already done so, but then hung up before being transferred to the escalation team.

In an effort to prevent fraud, many corporate service providers routinely send customers emails alerting them to recent activity on their accounts and asking them to verify that they requested that activity. Respondent could have easily sent such an alert to claimants asking them to verify that they wished to cancel their accounts when Mrs. Blaker did not remain on the line. But it did not.

Alternatively, respondent's call in center can direct callers to push #X to talk to an operator to cancel their account and then immediately transfer callers who push that number to the escalation team without going through multiple operators and retention efforts first. But respondent does not offer this option.

Nor did the operator explain to Mrs. Blaker that, even though she thought she cancelled the account months earlier, in fact respondent's records show the accounts open. While the operator did ask Mrs. Blaker to remain on the line so she could be transferred to someone who could "help her," the operator never explained that she had to remain on the line in order to finalize the cancellation. As far as Mrs. Blaker knew, she was being transferred to another operator for another sales pitch or collection effort. Instead of explaining that she had to stay on the line for the cancellation to be effective, respondent allowed claimants to continue to believe that they had already cancelled their accounts without ever explicitly explaining to them that, at least under respondent's required procedures, they had actually not yet done so. Accordingly, respondent "should have known" that claimants considered their accounts closed and no amounts owed.

Therefore, the panel finds that the respondent reported inaccurate information to the credit bureaus when it reported the claimants' delinquencies in the three months of November 2015, December 2015, and January 2016 because claimants cancelled their cards verbally and in writing before those dates and therefore did not owe the reported balances, and respondent never explained to them that their accounts would remain open on its end until the escalation team processed the cancellation.

*Inaccurate Information: Refundable*

The panel further finds that respondent reported inaccurate information because the fees and charges were not owed under one interpretation of its ambiguous contractual terms. Paragraph 9 of the terms and conditions provides: "The Annual Membership Fee

14

is refundable as long as you cancel your Account and have not used your card for any Purchases or Cash Advances and you have not made a payment."

VP Harwood testified that this sentence means that customers may obtain a refund of the first Annual Membership Fee if they <u>never</u> use the card after opening the account. Basically, the customer opened the account, then changed her mind, and never used it.

However, the panel finds the sentence ambiguous. The provision can equally mean that anytime respondent charges an Annual Membership Fee, a customer can obtain a refund of that fee as long as she has canceled the account and has not used or made a payment on the card after respondent imposed that specific Annual Membership Fee because the contract does not define or limit Annual Membership Fee to only mean the <u>first</u> Annual Membership Fee. Thus, arguably, any Annual Membership Fee is refundable, whether first, second, third, or hundredth, as long as the customer has canceled the card, not made a payment since that cancellation, and does not use the card afterward.

The panel construes this ambiguity against respondent, as the sole exclusive drafter of this standardized, non-negotiated agreement. Accordingly, the panel finds that claimants did not owe the fees and charges at the time they were reported to the credit bureaus; and, as such, respondent reported inaccurate information in violation of the CCRAA.

<u>Inaccurate Information: Notice</u>

The panel separately finds that respondent reported information it actually or constructively knew was inaccurate when it reported the deficiencies to the credit bureaus because respondent did not properly notify claimants of the fees as required by contract and regulation. The parties' agreement provides that the "Annual Membership Fee Notice, as required by regulation, will be provided to you at least once every 12 months." <u>See</u> Exh. 3. Claimants credibly testified that they never received the required written notice, and respondent did not introduce any such notices at hearing. Accordingly, the panel finds that claimants did not owe the charges in the absence of the regulatory written notice and that consequently respondent reported inaccurate information to the credit bureaus when it reported these charges as overdue.

<u>Incomplete Information</u>

Alternatively, the panel finds that respondent provided incomplete information to the reporting agencies because it did not include the fact that claimants disputed the fees when it reported the balances to the agencies. Respondents' telephone records show that claimants refused to pay and disputed the fees as early as November 28, 2015. <u>See</u> Exhs. U-V.  Yet, when respondent reported the "late balances" to the three credit agencies, it did not include this material information. Accordingly, the panel finds that respondent knowingly reported incomplete information within the meaning of the CCRAA.

15

*Damages*

The CCRAA provides for the recovery of actual damages, attorneys' fees, costs, and statutory damages up to $5,000 per violation. The panel finds that CCRAA "actual damages" include emotional distress, humiliation, proven lost credit opportunity, credit defamation, and economic loss damages. See Cortez v. Trans Union, LLC., 617 F.3d 688 (3d Cir. 2010) (FCRA); Dalton v. Capitol Assoc., 257 F.3d 409 (4th Cir. 2001) (FCRA); Guimond v. Trans Union, LLC, 45 F.3d 1329 (9th Cir. 1995) (FCRA and CCRAA).

- *Actual Damages: Pain and Suffering*

The panel awards the same pain and suffering damages under the CCRAA as an alternative ground to its award under the Rosenthal Act.

- *Actual Damages: Economic Damages*

The panel declines to award economic damages under the CCRAA for the same reasons it denies such damages under the Rosenthal Act.

- *Statutory Damages*

The CCRAA permits statutory damages of up to $5,000 per violation. Respondent conceded that it reported the deficiencies for three months to three different agencies. Based upon these reports, claimants requested $30,000 in their post-appeal brief. Accordingly, the panel grants this request and awards each claimant $15,000 in statutory damages under the CCRAA.

- *Attorneys' Fees & Costs*

The panel separately awards claimants their reasonable attorneys' fees and costs under the CCRAA in the same amount set forth above.

## Privacy Violation

To state a privacy claim violation, claimants must show an unreasonable, offensive intrusion into a reasonable expectation of privacy resulting in damage, loss, harm, or injury. The courts have permitted a privacy claim in a debt collection case where the collector exceeds the reasonable bounds of decency or otherwise uses unreasonable or outrageous means to collect the debt. See, e.g., Bundren v. Superior Court, 145 Cal. App. 3d 784, 789-90 (1983).

The panel finds that the claimants did not have a reasonable expectation that respondent would not call them to collect any amounts owed to it. The terms and conditions specifically permit such calls and the online forms authorize such calls. See

16

Exhs. A-B, proffered Exh. W, and Exh. 3. They did have a reasonable expectation, however, that those calls, their content, their frequency, and level would be reasonable, not offensive, and non-harassing. They further had a reasonable expectation that the calls would stop once they requested that respondent not call them. Courts have found an invasion of privacy in cases with much fewer calls than the number of calls in this case. See, e.g., Joseph v. J.J. MacIntyre Co., 281 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2003) (200 calls over 19-month period to collect a hospital bill as compared to over 200 calls in 19 days in this case). The panel finds that 247 calls in 19 days is conduct highly offensive to a reasonable person and on this separate ground awards the claimants the same pain and suffering actual damages awarded herein. The panel does not award attorneys' fees and costs on this violation.

## TCPA Violation

The TCPA prohibits the use of an Automated Telephone Dialing System ("ATDS") to call a consumer's cellphone without prior consent.

### ATDS

Respondent argues that it did not use an ATDS to contact claimants and therefore it cannot have violated the TCPA as a matter of law. Respondent does not use prerecorded messages or robotic calls. Respondent uses calling systems that call the customer and then transfer the call to a live agent when a live customer picks up the call. Respondents rely heavily on ACA Int'l v. FCC, 885 F.3d 687, 703 (D.C. 2018), a recent DC Circuit decision that effectively repealed and rolled back portions of the 2015 FCC order defining ATDS.

Respondent also argues that its third-party vendors are in charge of the systems used to call claimants and it does not know the specifics of those systems sufficiently to determine if they qualify as ATDS. Respondent also testified that it requires TCPA compliance from all of its vendors. Respondent therefore asserts that claimants have not met their burden of proof under law or fact to show that respondent employed an ATDS to call them on their cellphones.

The TCPA defines an ATDS as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers." 47 U.S.C. Section 227(a)(1). The 2015 FCC decision interpreted "capacity" expansively to include potential capacity, thereby bringing smartphones into the definition. The 2015 FCC decision also reconfirmed the agency's prior rulings that "predictive dialers" fall within the TCPA's definition of an ATDS. The court in ACA curtailed the part of the 2015 FCC definition of ATDS that expansively included smartphones and other devices with the potential and future capacity to operate as an auto-dialer. Instead, the court interpreted "capacity" to mean current capacity. The ACA decision did not overturn other parts of the FCC order or prior FCC orders.

The panel finds that the systems used to call claimants qualify as an ATDS as defined and used in the TCPA. VP Harwood testified that all three of its outside third-party vendors use systems that have the <u>current</u> capability to call customers using any one of three methods including auto-dialing. He also testified that the systems are "predictive" as he defines and understands the term (the system determines how many calls to make to generate a live response) and that they have the current capacity to randomly and sequentially dial telephone numbers, although he did not know if the vendors used them in that way in this particular case. Claimants also testified that they heard a pause in the calls which signaled to them that a machine had called the number and then transferred it to a live operator once a person answered. The recordings played at the hearing confirmed this pause, a click, and then transfer. Accordingly, the panel finds that claimants sustained their burden to show the use of an ATDS as defined in the TCPA.

*Consent*

Respondent next argues that, even if it did use an ATDS, claimants consented to its use and therefore cannot state a claim under TCPA as a matter of law. As noted above, claimants agreed to the use of an auto-dialer to call them when they applied online and checked the authorization box.

Claimants counter that the consent, even if given, was neither "knowing" nor "informed." The panel agrees that the consent was not knowing or informed as to the frequency of the calls but the TCPA (unlike the Rosenthal Act) does not concern itself with the number of calls, but rather the technology used to effectuate them. Here, claimants specifically agreed to the use of auto-dialer technology.

*Revocation of Consent*

Claimants argue that, even if they initially consented to the use of an ATDS, they revoked their consent when they cancelled their cards in late January/ early February 2015 and again in subsequent calls.

Respondent relies on <u>Reyes v. Lincoln Auto Fin. Servs</u>., 2017 WL 2675363, at *5 (2d Cir. 2017) to argue that claimants cannot revoke their consent as a matter of law when they consented in writing as part of an express contractual provision. Essentially, respondent argues that customers cannot unilaterally revoke consent given in a legally binding, "bargained-for contract."

The panel finds <u>Reyes</u> inapplicable because the parties' contract was not a "bargained-for contract;" it represents an adhesion contract with terms and conditions exclusively set by respondent. Moreover, <u>Reyes</u> constitutes nonbinding precedent, inconsistent with the weight of other circuit authority. Further, the FCC has opined that prior consent could be revoked at any time and by any reasonable means. <u>See In the Matter of Rules & Regulations Implementing the TCPA of 1991</u>, 30 F.C.C. Rcd. 7961, 7993-94 (2015). The Ninth and other circuits agree. <u>See, e.g., Osorio v. State Farm Bank, F.S.B</u>., 746

18

F.3d 1242, 1255 (11th Cir. 2014); Gager v. Dell Fin Servs., LLC, 727 F.3d 265, 268 (3d Cir. 2013). Even the ACA decision, which overturned part of the 2015 FCC order, upheld the Commission's approach to revocation of consent, which rejected the idea that "the caller can unilaterally prescribe the exclusive means for consumers to revoke consent" and instead allows a party to revoke consent through any reasonable means.

Further, respondent's own practices permit unilateral revocation. VP Harwood testified that respondent honors verbal requests to stop calling. He explained that if an identified customer requests that the bank stop calling that particular number, then respondent will put a "block," a DNP (do not place), or DNC (do not call) on that number and direct its own staff and vendors not to call that number ever again unless the customer reinstates consent to receive calls.

The panel finds that the claimants can legally and did factually revoke their consent as to calls made to the 1300 number no later than January 2, 2016 (and arguably much earlier) when Mrs. Blaker told respondent's representative in a recorded call played at the hearing for the panel: "if you call again, I am going to sue you." See Exh. 29.

At that point, under respondent's own policy, the representative should have marked the 1300 number as blocked and do not call. While the panel understands and accepts respondent's testimony that the representative did not mark the 1300 number do not call because he was more preoccupied with trying to transfer the call to the escalation team to effectuate the cancellation of her cards, his desire to focus on the cancellation request did not relinquish him from his duty to mark the 1300 number as blocked and do not call pursuant to respondent's policy given Mrs. Blaker's clear and express admonition not to call again or risk a lawsuit.

Conversely, neither claimant revoked consent as to the 1581 number. Mr. Blaker never answered his phone, never told respondent not to call him at that number, and Mrs. Blaker never requested that respondent stop calling the 1581 number. Her requests to stop the calls always came from the 1300 number. Accordingly, the panel finds that claimants revoked their consent as to calls placed to the 1300 number but not as to calls placed to the 1581 number.

*Reinstatement of Consent*

Respondent posits that, even if claimants revoked their consent, they reinstated it when they called respondent themselves by telephone after revocation. The panel questions whether customers can reinstate consent to ATDS calls simply by contacting their service provider from a cellphone. However, the panel finds this issue moot because claimants did not substantively telephone respondent after January 2, 2016's revocation. Mrs. Blaker only returned a call placed to her in order to find out who had called. She then promptly hung up when she realized it was respondent. See Exhs. U-V. The panel therefore finds that claimants did not reinstate consent as to the 1300 number.

_Vicarious Liability_

Respondent argues that it should not be held liable under the TCPA as a matter of law because third-party vendors, and not respondent itself, placed all the calls to the 1300 and 1581 numbers. Respondent conducts about 20% of its own collection efforts from its Nevada offices and outsources approximately 80% of its collection efforts to third-party vendors. Respondent randomly selects which debt collectors will handle which accounts. Here, third-party vendors exclusively handled respondent's collection calls on both claimants' accounts. Consequently, respondent asserts that the panel cannot find against it because those vendors, which claimants did not join as defendants, bear exclusive legal responsibility for their own calls.

The panel finds respondent legally responsible for the calls placed by its third-party vendors for several reasons. First, respondent in fact exercises great oversight over its vendors. It sets and directs the practices, protocols, and policies for how vendors may call its customers. While respondent may not detail precisely what time of day vendors may call (statute already dictates those constraints as 8 am to 9 pm customer time), it does impose on vendors strict requirements about how many calls it can place a day, how to record data about the call content itself, how to stop calls when requested by the consumer, how to escalate a call to a supervisor, and how to note the account record to reflect the contents of the conversation if the customer answers. Respondent also instructs its vendors not to call a number again the same day if they left a message earlier that day.

Second, as VP Harwood also testified, respondent requires ATDS compliance from its vendors. Respondent provides each of its vendors with a copy of its procedure manual and expects those vendors to follow it.

Third, respondent communicates several times a day with its vendors. It nightly exchanges data with the vendors including all calls placed on a daily basis. Therefore, respondent can and does monitor and review calls on a daily basis. It can also listen to recordings of calls.

Fourth, respondent expressly reviews and monitors its vendors' compliance. Respondent's operations department conducts a compliance review to spot check if vendors are properly following the law and its call procedures and policies. The department monitors the quality of telephone calls to customers. Respondent's compliance department then reviews the review team to ensure that they are properly monitoring the vendors.

Respondent even visits every third-party vendor office worldwide to ensure compliance with its policies and protocols. VP Harwood testified that he personally used to fly all over the world meeting with focus groups comprised of every type of employee at each third-party vendor office.

Fifth, respondent specifically dictates call frequency. It can and does direct the vendors on the number of calls they can place daily to any given number – currently, the respondent-directed maximum is 8 calls a day to the primary number listed on the account. Respondent neither limits the number of calls on a weekly basis nor restricts the days on which the vendors call. Vendors can call 7 days a week. Respondent itself does not use and does not allow its vendors to use skip trace. Accordingly, it also provides the specific numbers to call without which the vendors could not have contacted the claimants even once, let alone hundreds of times. Basically, respondent sets the rules by which and the numbers at which vendors may contact its customers.

Importantly, customers also believe they are speaking with respondent directly because the operators identify themselves as calling on behalf of Credit One Bank as the panel heard in the recordings played at the hearing. Respondent authorizes its vendors to operate the calls on its behalf. It authorizes them to accept payment on its behalf. It authorizes them to escalate, block, and/or service a call on its behalf. In short, its vendors operate as respondent for purposes of customer calls.

Finally, the panel also finds respondent legally responsible for the calls on public policy grounds. A contrary finding would mean that every credit card issuer or debt collector could simply contract out the collection part of their business to third parties and then insulate themselves from liability for those third parties' actions undertaken on their behalf– leaving its consumers with no true legal recourse and/or forcing them to bring lawsuits against the third party vendors with whom they themselves do not have a contractual or arbitrational relationship. The panel believes that Congress neither intended nor would approve such an outcome.

Instead, respondent's remedy for third-party vendor errors is to seek indemnification from its vendors for violation of its policy, not to escape liability under the TCPA or shift the consequences of those errors to the very consumers Congress intended to protect in enacting the TCPA.

*Damages*

The TCPA permits the award of $500 per call violation and treble damages up to $1500 per call violation for willful conduct. The panel finds that the February 1-19, 2016 calls constitute willful conduct as that term is used in the TCPA and awards claimants $1500 per call for the 228 calls placed to the 1300 number for a total of $342,000. The panel finds for respondent as to the calls placed to the 1581 number and awards no damages as to those calls. The panel further finds for respondent for any calls to either number before February 1, 2016. The panel does not award attorneys' fees and costs for this TPCA violation.

**Final Award**

We, Janice L. Sperow, Leo Sullivan, and William Tucker, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration

21

agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, and having previously rendered an Interim Award dated June 1, 2018 do hereby, AWARD, as follows:

1. For claimant Samantha Blaker on the Rosenthal Act violations in the amount of $1,000.00;
2. For claimant Richard Blaker on the Rosenthal Act violations in the amount of $1,000.00;
3. For claimant Richard Blaker on the Rosenthal Act violations and alternatively on the invasion of privacy claim in the amount of $2,500.00 in actual pain and suffering damages;
4. For claimant Samantha Blaker on the Rosenthal Act violations and alternatively on the invasion of privacy claim in the amount of $10,000.00 in actual pain and suffering damages;
5. For claimants jointly under the Rosenthal Act and the CCRAA, reasonable attorneys' fees in the amount of $24,151.30 and costs in the amount of $1,106.15;
6. For claimant Samantha Blaker on the CCRAA violations in the amount of $15,000;
7. For claimant Richard Blaker on the CCRRA violations in the amount of $15,000;
8. For claimants jointly on the TCPA violations as to calls placed to the telephone number 1300 in the amount of $342,000; and
9. For respondent on the TCPA claims as to calls placed to the telephone number 1581.

The administrative fees of the American Arbitration Association totaling $2,900 and the compensation of the arbitrators totaling $11,250 shall be borne as incurred.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

This award resolves all issues between the parties. All claims not expressly granted are, hereby, denied.

DATED: July 19, 2018

BY: _____

Panel Chair; Janice L. Sperow, Arbitrator

22

_____
Panel Member, Leo Sullivan, Arbitrator


_____
Panel Member, William Tucker, Arbitrator

23

Panel Member, Leo Sullivan, Arbitrator

Panel Member, William Tucker, Arbitrator